Good afternoon, Your Honors. My name is George Yarin. I represent Appellant and Plaintiff, Palmer Plastics Corporation. And thanks to both of you for enduring our long session. I found it quite interesting, actually, so let me, if I may, ask that I may reserve a couple of minutes for a rebuttal, if I may. At the outset, the initial issue that is presented, of course, is a pure de novo review issue, pure legal issue, that of being the interpretation of the business income loss benefit contained within this particular business interruption policy sold to my client. We think it's important to bear emphasis that Nevada jurisprudence, relative to coverage, begins with the proposition that we interpret insurance policies from the standpoint of a reasonable lay person, not trained in law and not trained in insurance. With that having in mind, we then go on and look to see if the insurance interpretation is reasonable, then regardless of any other competing interpretation, we must adopt the interpretation which affords the insured the greatest possible coverage. It's a very generous interpretation. Yes, Your Honor. Was there any objection to the instructions on business loss? The jury found that he was entitled to a rather modest or small addition. So how was the jury instructed? It seems to me that's critical. Your Honor, the jury was instructed in accordance with the Judge Reed's interpretation of the policy. It was Judge Reed's interpretation as indicated in the motions for partial summary judgment and reiterated again prior to trial as to specifically what the experts had to use by way of a computational formula. And so as a result, the experts were required to testify with figures utilizing the formula which was dictated to us by the court below. And it's that particular formula that we take issue with. So it's not necessarily the instructions so much as it is the dictate that we received from Judge Reed as to how this particular formula was to be derived utilizing this language. Now, in that respect, Judge Reed correctly observed that this particular policy contained no formula to guide an insured as to how to determine the degree to which they're entitled to a business income loss if a calamity were to occur. Now, from there, it bears noting also that business interruption policies are not all the same. Some have more explicit language. Some are more general. Some are, frankly, vague. Some are somewhat ambiguous. The fact is that this particular policy had no formula and no guidance as to how you calculate that particular loss. Now, we looked to a couple of cases that interpreted policies that were substantially similar to this one, most notably the Continental Insurance v. D&E decision, which came down from the Tennessee Supreme Court. And in a per curiam unanimous decision, they adopted a formula that was consistent with what Polymer was advancing. And that was you calculate the net profit loss as a result of the calamity and add the continuing normal operating expenses incurred during the period of restoration. That formula was reiterated and adopted by the Eastern District of Louisiana in the U.S. District Court opinion involving B.F. Carvin. Now, Carvin, rather. Now, we're fine with those formulas. The problem is that the Court was not fine with those formulas, and the Court looked and said, well, you know, excuse me, it seems to me that if you follow that formula, there is a problem here. And the Court, in its order you'll see, basically said that you really end up allowing the insured to recover its continuing normal operating expenses incurred twice if you follow that formula. Now, I couldn't follow that rationale, but nonetheless, that was the genesis of why the Court then said, so in this Court's view, you must add an additional step. You must subtract from that formula gross profit. Now, the concern we had with that, first off, is the words gross profit and any restriction like that doesn't appear anywhere in the policy. The Court was adding an additional variable that was nowhere in the policy. The other problem was the policy. Well, but just a minute. Nowhere in the policy? I guess we have to interpret what the policy says. Precisely. We have to look at every word in the contract. All must be given effect. We have to look at the entire contract. And I guess my worry about that is we also have to apply some state law in these particular situations. Now, if we're going to put the insured in a better position than they would get, even if they'd gone forward with the particular business they had and wouldn't have had any business interruption laws at all, and we're going to put them in better condition and better position than that, that doesn't seem to be a view very consistent with the policy, does it? Your Honor, if there is a risk of a theoretical windfall, that's not of our creation. That's Hartford's creation. We submit that all that the policy is providing is that which we paid for. And that formula was set out in those two opinions, which we agree is a perfectly reasonable interpretation. Well, I expect you agree with them because they help you. But all I'm suggesting is we're now in Nevada, we're applying Nevada state law, and we're looking at every word of this contract to make sure that it works. And I guess I'm trying to figure out what part of this contract do I see that would put an insured in a better position than it would have been had they not had a loss? I don't believe that they would be because, for one, by utilizing by a – frankly, Your Honor, I guess I have to pose the question. I don't see under our circumstances how we're necessarily put in a better position. We suffered a five-and-a-half-month period of restoration, which presumptively means we're in a position in which we're unable to conduct business as normal. And the insurer is allowed to litigate whether or not that was a reasonable period or not. Well, the jury found that that period was fine. It was actually four-and-a-half months, but we get an extra 30 days for extra business income coverage for 30 days beyond that. But the point is, is that we suffered a significant loss or interruption that resulted in inability to conduct business normally. With that having been said, I would submit that we are not being put into a better position. In fact, we didn't get a dime from the insurance carrier for three-and-a-half months. The insured had to rely upon its own accounts receivable and ultimately had to start laying off its own people before it ever got a dime from Hartford. I don't think that's being put in a better position, when ultimately you're having – you're forced to lay off your people, you're forced to use your own accounts receivable to kind of stay above water. In the meantime, you're not able to pay your bills. Your creditors are cutting you off. I don't think that's being put into a better position, Your Honor. Let me ask you another question. Is there anyone here who ever challenged the meaning of continuing normal operating expenses? Yes, Your Honor. For one, it's not entirely clear what they mean by continuing normal operating expenses incurred. Are they referring to expenses that were antecedent to the calamity, or are we only talking about the expenses that, in fact, continued post-calamity and were incurred post-calamity? That's – I have a problem with how do you lose an expense if it continues? Where's the challenge to the continuing normal operating expenses? It's my understanding that your challenge is really we ought to take continuing normal operating expenses, which is what they did in the other case that you're citing, and we ought to add to that gross profits. And that if we did that without adding back the amount of income, gross income is what they called it, in it, you'd be satisfied with that interpretation. I'm not asking that we add in gross profits. No, no. I say if we did not add in the gross profits and we just took the gross – the net income calculation plus the continuing normal operating expenses, that you would be satisfied with, correct? We would be satisfied if we were awarded the net amount of profit that we should have earned but did not, and, of course, subtract from that whatever income we did derive during the period of restoration. I'm not suggesting that we – that that shouldn't be deducted, because otherwise it wouldn't be a loss of net profit. It's the actual loss of net profit comparing the profit before the calamity versus the profit that was derived afterwards. My concern is, what do we do about the continuing normal operating expenses incurred, including payroll? The Tennessee Supreme Court in the Eastern District of Louisiana says, well, that's a positive number. You add that to whatever was the amount of profit that you – that you did not realize but you otherwise would have, subtracting from that what profit you did actually earn, if any, during the period of restoration. That's the formula that they were using, and we submit that's a perfectly acceptable formula. Otherwise, the insured is forced to basically expend its own accounts receivable as they come in to stay afloat. They've put into the dilemma of having to decide whether or not to start laying off people or not, and they shouldn't be put in that dilemma. If the insurer steps up and pays for the continuing normal operating expenses incurred during the period of restoration, then the insurer is never put in that Let me conclude on that particular point simply that, you know, at some point Well, you disagree with the district court that you're getting double compensation. Correct. We do disagree with that. We believe the court was mistaken in that belief. At some point, in an effort to try to harmonize unclear provisions in an insurance policy, it seems to me that one can eventually start departing from what language is actually used in the policy and actually begin starting inserting terms that just don't exist in the policy, and we submit that's what occurred here. And as a result, effectively, Polymer was put into this position in which certain restrictive language was being inferred that didn't anywhere appear in the policy. Now, if there was some degree of windfall, and we don't submit that it was. We believe that all we're getting is what we paid for under the policy. But if there was, that risk, that risk of a windfall, if there was one, is not one that the insured should have to bear. It's one that the drafting insurer should have to bear if they used unclear language, language that was not explicit and clear, in limiting the recovery under the policy. Are there any other questions regarding that particular issue? No. You have about three minutes left. Do you want to save some for a bottle? I would like to. Thank you. You may have pleased the court. My name is Andrew Downs. I represent Hartford Cash, the insurance company in this case. Time and the panel's interest permitting, I'm going to discuss principally the actual loss of business income coverage grant. Secondarily, I may discuss the other issues that were fairly well briefed by the parties. But I want to start with the actual loss of business income coverage grant, because I think that is the critical issue here. And I think it's important to understand that what we're focusing on is the term actual loss in the coverage grant. What Palmer asked the trial court to do when it first moved for summary judgment, what it has continued to argue throughout this case is to eliminate the phrase actual loss and just look at the policy definition of the constituents of business income. Well, actually not. I mean, if I understand their argument today, what they're saying is net income plus continued normal operating expenses and you minus out whatever income they received, net income they received. And why is that a double counting? I don't know. I'm not sure I follow. That may not be double counting because this afternoon was the first time I ever heard that particular formulation. That's not the formulation that's in their brief where they argue for the $400,000 based on ER-25. And that's almost identical to what Judge Reed did. I don't think so. I mean, and I have to say I've taken some time to get my head around it, but I don't understand how gross profit figures in here at all. Enlighten me. Because in a manufacturing business, as it wouldn't be true, for example, in my law firm and Mr. Yarren's firm, but in a manufacturing business, you have costs that are allocable to sales. For example, if I manufacture widgets, my cost of acquiring the raw materials and assembling those widgets is, as a matter of generally accepted accounting practices, accounted for when I sell those widgets. That is known in the trade as cost of goods sold. Right. Revenue less cost of goods sold is gross profits. Operating expenses are the rent I pay for my facility, my office staff salaries, my insurance premiums, the property taxes I pay, vehicle costs, whatever else it is I have. What Judge Reed said is we will take 100% of the continuing operating expenses, the net profit that would have been earned. In other words, if the company was going to earn $10,000 a given month, take that $10,000, add it to those operating costs, then subtract from that the gross profits actually earned. What that does is it gives the insured dollar for dollar credit for all of their continuing operating expenses, yet it takes out of the equation the ---- Well, perhaps, but it sort of seems like you're mixing two accounting principles and coming up with a number that may or may not make sense. I mean, I ---- but go ahead. Well, if I would ---- I think it's a legitimate concern, but the reason it does make sense is because if you used net profits actually earned instead, you would be backing out the cost of goods sold on the goods they already actually sold, which they're entitled to recover. And you don't want to back that out. You want to back ---- which is a smaller number. You want to back out the gross profits because that way you're capturing the revenue for what they actually sell and generate and do. So they get paid for it. And you're capturing the difference between what happened to them and what would have happened if this had not occurred. And that's the goal, is to attempt to capture the difference. The party's dispute, at least up until today, was over do we do actual loss or do we do the add everything together and forget about what they did. I do understand that difference, and that's been brief. But just in terms of looking at the policy language and the direction, I think it might have been easier for the ---- for them simply to follow the ---- for the experts to follow and the court to follow the policy language, which says give us your operating expenses plus net profit. And I think that's a different number than either of you have proposed. Am I wrong on that? I believe you are, Your Honor. And I again direct you to ER-25, because one of the things that my expert did in the course of the arguments on the summary judgment, and particularly in the arguments on the good faith issues, is he submitted his calculation. And he submitted the calculation in two fashions. One was the way that it's traditionally been done in the forensic accounting field, which for a variety of accounting reasons cuts a few corners. They look at the cost categories they believe change, and they ignore the others and figure out what the difference is, which is not method Judge Reed chose, methodology Judge Reed felt was appropriate. And the other thing he did is he then did the methodology Judge Reed showed. And he showed that if you make the same set of factual assumptions, because we're always projecting what didn't happen, so we're making a series of assumptions, the numbers come out to be mathematically identical. And as I understand it, the dispute has been over whether or not we simply add the two components of the business income definition together and award that versus something which calculates actual loss. Neither Palmer nor Hartford has argued that the methodology the Court ultimately chose was not an accurate methodology for carrying forth the interpretation of the phrase actual loss that the trial court came up with. And, frankly, an interpretation that's consistent with Continental versus D&E. I want to discuss that case a little bit. That's a case that went to the Tennessee Supreme Court on certification from the Sixth Circuit. And the Tennessee Supreme Court has asked two questions. The second one became moot based on their ruling on the first one. And the first question was, do we have to add together the two components of the definition of business income if one of them is a negative number? Tennessee Supreme Court said yes. And this was in the context of a business that was closing down and was liquidating its assets and really wasn't going forward. So it had a somewhat different looking income statement as a result. The Tennessee Supreme Court never addressed the issue of what do we do with the words up here that say actual loss because it wasn't before. The Sixth Circuit didn't ask. The parties weren't arguing it. The same thing is true in the case, the unpublished case out of Louisiana that we attached to our brief, the Carbon case. Because nobody was arguing about whether or not you do or don't get actual loss. They were arguing about how you deal with the two components of the business income definition in reaching that actual loss. So one of the things, and I pointed it out in the brief, is I think that the – I'm going to skip it because now Mr. Yarren is conceding that you subtract net income, which he wasn't before in the analogies I was going to go through don't work on a net income one. But I do briefly want to discuss the issues related to the conflict of interest issue because I think there's an important accounting function here that wasn't covered in the briefs. We insured the landlord. We also insured Palmer. We insured the landlord against the landlord's equivalent of business income loss, which is its loss of rents. If Palmer stays in the premises and pays rent, that rent goes into its continuing operating expenses and they get dollar-for-dollar credit for it in the loss adjustment. If they move out, they stop paying that money. It drops out of their continuing operating expenses. And their business income loss, in essence, goes down on that particular accounting category. But that exact same amount of money gets picked up and moved over into the landlord's claim. You have to refresh me. Is the landlord on a separate policy or additional insurance? No, separate policy. So why does that make any difference? I mean, let's assume it's a traveler's. You know, since I use your company as a hypothetical, let's say traveler's. I mean, it's a traveler's problem. That's – I agree with you, Your Honor. And even if it ends up getting paid twice, you know. The argument Palmer has made was that there was some kind of conflict of interest because we let the same gentleman, Mr. Yaunt, adjust both claims. Our answer to that is there's no – and he uses it to argue there's economic motivation. Our position is there's no economic motivation because the dollars come out in the wash at the end of the day. I take your point. Beyond that, and I realize it's late, but I also have several minutes to go, I don't have anything else to add unless the panel has further questions for me. I have none. None. Thank you. Briefly, Continental v. D&E definitely addressed the issue of how do you – what formulas to be used. In our view, they were very explicit, they were very clear, and our position has never changed. Our position has always been the same. We agree with the Continental v. D&E decision. We agree with the Continental v. D&E formula, and we think that should be applied and should have been applied in this particular case. Now, the Court expressed a little bit of – expressing a little bit of confusion about, for example, how does gross profit enter into the equation and so forth. Well, it entered the equation because of the district court, and that's – Well – Well, and also I understand the other case. I guess that the rhetorical question to pose is would a reasonable layperson ever come up with a formula that Judge Reed did? If the answer is no, then we know that that's not the correct formula. Would a reasonable layperson come up with a formula that was used in Continental v. D&E? Very possibly. Let me ask you a question. Where in your briefs, because that's why I was a little worried about what you were suggesting there and gave you a few more questions, where in your briefs do you say that the amount of profit that you gain or the amount of income that you gain during that period should be subtracted from the result of the policy? As I read Continental v. D&E, that's how I interpreted it. But as I read your briefs, I mean, your briefs really go to the fact that I understood it. You wanted the net income plus the normal operating expenses without anything added or deducted from it. Well, I was – then perhaps I was inarticulate, but I was trying to simply say that we agreed – Because it seems to me that what you're now suggesting, and that's the worry that I have, is that what the good judge did was correct, because all he did was take the gross profit that would have offset anything that you may have got in the operating expenses and take it out. This is the fallacy of what Judge Reed did. He added a fourth variable, if you will. That was the concept of gross profit. But he defined gross profit as being net profit plus continuing normal operating expenses incurred. No. He determined that gross – the calculation that I saw, it was total profit less than the cost of goods sold. That's not my recollection. My recollection is, well, what's left is net profit plus continuing normal operating expenses incurred. That's the only thing that's left. Now, if you're going to subtract out gross profit, and one of the elements of gross profit is continuing normal operating expenses incurred, well, what did you do with the first part of the equation? You just dropped out continuing normal operating expenses incurred. So the only thing you're left with is net – is net profit that you should have earned minus net profit that you actually did earn. And continuing normal operating expenses completely now drop out of the equation. That's the fallacy. And he was doing that purposely because he had this conception that to do otherwise, to follow Continental v. G&E, would allow the insurer to collect continuing normal operating expenses twice. And I had the most devil of a time trying to figure that out. My worry is that you just gave away the ranch by saying that you're going to deduct some measure from this calculation that you suggest is what we ought to do under the policy. What is the profit you suggest ought to be deducted? We simply ask that the formulaic expression from Continental v. G&E should be adopted. We've always said that. Well, let me ask it a different way. In answer to my question, Mr. Downs said, look, if you look at the record, if you take the formula of net profits plus operating expenses and take out the actual net profits that you earn, you come up with our number. Do you disagree with that? I don't believe he's correct, no. I believe that is the Continental v. G&E formula. And we embrace that. Okay. Thank you, gentlemen. We will study the formulas carefully. And the case just argued to be submitted. And, again, thank you for your patience. I know it's been a long day for you. And we appreciate it and appreciate your briefs and arguments today. And we'll be at recess for the afternoon. All rise. The floor is for discussion. Stand to be served. Thank you.
judges: Fletcher B. , Thomas, Smith R.